IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| SELINA BOLAND, a married individual, Respondent/Cross-Appellant, v. SHU-MEI WANG and BEIJING MEN, wife and husband, Appellants/Cross-Respondents. | No. 86716-4-I DIVISION ONE UNPUBLISHED OPINION |

COBURN, J. — Shu-Mei Wang and Selina Boland had a partnership for about a year during which they "flipped"[1] five houses for profit. Consistent with their partnership agreement, Boland and Wang evenly shared the profits from the sales of the first four houses. Following the sale of the fifth house, Wang materially breached the parties' agreement by taking the partnership's profits for herself. The trial court awarded damages to Boland for Wang's material breach. Wang appeals, claiming that (1) her breach was excused by Boland's failure to meet her 20-percent capital contribution obligation under the parties' agreement and (2) the trial court's findings are insufficient to support the damages award. Boland cross-appeals, claiming that the trial court abused its discretion by (1) not reimbursing her for capital contributions in its calculation of damages and (2) denying her motion to amend her complaint under CR 15(b). We

---

[1] Meaning to purchase, renovate, and resell.

agree that the trial court abused its discretion in denying Boland's CR 15(b) motion but otherwise find no error. Accordingly, we affirm in part, reverse in part, and remand for further proceedings.

FACTS

In December 2020 Wang and Boland executed an agreement creating their partnership business Best Choice Homes, LLC (BCH) for the purpose of flipping properties for profit. See Ex. 1111. The parties agreed that Wang would contribute 80 percent of the capital investment to BCH and Boland would contribute the remaining 20 percent while also performing services for the partnership in the form of "sweat equity," which included managing the construction and renovation of the properties and acting as the real estate agent to sell the properties. The parties agreed to evenly share BCH's profits. Id. Boland had a separate company, Pacific Red Door Development, Inc. (PRD), that renovated homes. The parties agreed that BCH would reimburse PRD for directly incurred renovation costs and that PRD would not charge BCH a management fee on top of the direct costs. The parties did not contemplate as to what would occur if Boland failed to meet her 20-percent capital contribution obligation.

In January 2021 Boland and her husband purchased a piece of property called "Redmond Raw Land." Title for the land was under PRD's name. Wang understood the Redmond land was "part of the BCH deal" and that Boland's down payment for the Redmond land constituted Boland's capital contribution to the partnership. Around this same time, Boland and Wang discussed the possibility of merging BCH with PRD. Wang emailed Boland in March that she was not interested in a merger.

BCH flipped five houses. In October 2021, around the sale of the second house, the parties' relationship eroded when Wang, Boland, and Boland's husband got into a disagreement as to whether Wang co-owned the Redmond land as "part of [the] BCH deal." Boland's husband told Wang that the Redmond land was never part of the partnership arrangement. Title for the Redmond land was never put in BCH's name.

The following month Boland sent several PRD invoices to Wang as email attachments for "project expenses" as of November 10. Ex. 1138. In her email, Boland stated that the expenses "could be changed on final, there may be some receipts I have not input yet, but it is very close to the above numbers." Id. Wang asked Boland to provide supporting receipts and payroll time cards. Boland did not believe she needed to provide such proof of PRD's expenses under the parties' agreement. Though some of the expense receipts were digitally kept on an online document storage drive that Boland shared with Wang, the drive did not contain all the receipts necessary to allow Wang to verify if Boland's reported expenses or labor costs were accurate. Wang repeatedly asked Boland for additional information, but Boland would either not respond, say she was busy or sick, or send incomplete information.

BCH profited about $700,000 from the house sales. After each of the first four properties were sold, BCH reimbursed PRD for its renovation costs that were either paid initially by Boland or out of PRD's funds. Boland and Wang evenly split the sale profits after each of the first four houses were sold. See ex. 1145.

BCH sold the last of the five houses in January 2022. Wang satisfied her 80-percent capital obligation by providing the down payment for the five properties. PRD performed renovation services for the five houses.

3

At some point, Boland and Wang agreed to dissolve and wind down BCH after the fifth house was sold. On January 17, 2022, following the sale of the fifth house but before BCH received the sale proceeds, Boland sent an email to Wang with Boland's accounting of how the proceeds should be distributed from BCH's bank account. Ex. 1146. In anticipation of having $433,301.51 deposited into BCH's bank account the next morning, Boland informed Wang that she should receive $188,703.44 in reimbursement for her capital contribution, Boland should be reimbursed $43,779.10 for her capital contribution, and the remaining funds should be evenly split so each party received $100,409.49 in profit. Id.

Wang responded the next morning questioning Boland's numbers, wanting more detail, and explaining she did not see receipts and timesheets in the shared online drive. Id. That same day, after the sale proceeds from the fifth house were deposited into BCH's bank account, Wang withdrew $433,700.00 without Boland's knowledge, leaving about $100. See ex. 1127. Boland emailed Wang asking Wang to return the money to the account. Ex. 1146. Wang did not answer Boland or respond to Boland's other contact attempts. Eventually, Boland contacted Wang's husband Beijing Men who told Boland that she would need to sue if she wanted her money back.

Boland sued Wang for breach of contract, conversion, and unjust enrichment based on Wang's withdrawal from BCH's bank account. Wang asserted in defense that the claims were barred by Boland's own breaches of the parties' agreement and raised counterclaims, including for breach of contract and conversion due to Boland's purported failure to meet her 20-percent capital contribution obligation to BCH.[2]

---

[2] Wang raised additional counterclaims and statutory derivative claims under chapter 25.15 RCW that are not at issue in this appeal.

A bench trial followed in February 2024. The trial court heard testimony from Boland, Wang, and Wang's expert who relied on models related to damages and capital contributions based on documents and assumptions provided to him by Wang's counsel. Boland did not present any expert testimony.

Boland testified the parties did not specify when and how Boland would contribute capital to BCH and that her capital investment was mostly through construction costs "gradually, as we needed."

Wang introduced a document prepared by Boland titled, "Business Plan- Best Choice Homes LLC (the Company)," which was admitted as exhibit 1135. The document expressly states it was agreed to by Boland and Wang on January 13, 2021. Ex. 1135. The document lists BCH's total funding as "$1,000,000.00" according to "schedule 1." Id. The third page of the exhibit is titled, "Schedule 1- Funding allocation as of March 2nd 2021," and lists entries for the Redmond land totaling $227,977.71, including down payments in the amount of $216,947.71. Id. At the time the parties' partnership started, Wang testified she understood that the Redmond land entries, including the down payments, constituted Boland's capital contributions to BCH. Wang denied ever agreeing to Boland submitting her capital contributions gradually over time.

Wang also introduced a balance sheet for BCH dated February 9, 2021, admitted as exhibit 1132, which listed the Redmond land as a fixed asset of BCH valued at $554,500. Wang testified this meant that the Redmond land "is part of the BCH deal." The document shows Boland's equity in BCH as $234,094.71, which Boland testified was similar to the number on "Schedule 1" of exhibit 1135 that was mostly comprised of the Redmond land.

Wang testified she learned that the Redmond land was no longer part of her partnership agreement with Boland during the meeting in October 2021 when Boland's husband told Wang that the Redmond land was never part of the deal. Wang was "shocked" and felt "scammed." In November, in an email admitted at trial, Wang wrote to Boland:

> [Y]ou never disclosed the Redmond lot is under your LLC, not under [BCH] till I found it out in this June. I was invited to view the lot, participating the city meeting, emails exchanges with all this Redmond land be counted in. How could you suddenly change your mind … [by] claim[ing] it is owned solely under you and your husband?

Ex. 1139.

During a colloquy with the trial court, Wang's forensic accountant expert Jeff Lounsberry testified that the parties equally split the profits when they sold the first four houses. Lounsberry testified that Wang had not been fully compensated for her total capital contribution of $800,000 when the fifth house was sold and that she was still owed about $191,000.

Lounsberry also testified to email correspondence between Boland and Wang in August 2021, admitted as exhibit 1113, wherein Boland acknowledged she needed to contribute about $165,000 to meet her 20-percent capital contribution requirement. Boland wrote that she owed BCH "about $165,629.65 to match[ ] [Wang's] current amount of $713,558.65" to be "up to date regarding the capital percentage." Ex. 1113. A spreadsheet attached to the email lists Boland's "Current Capital in [BCH]" as "$12,760.00" and the amount "[o]wed [by Boland] to match 20% of [total capital]" as "$165,629.66." Id. Boland testified she "roughly" came up with the amount of "$165,629.65" based on her thinking that if the partnership "didn't end up well, that is

6

a[n] amount I should … write back to [BCH]." Boland said the parties never discussed this number and that she never paid the amount to BCH.

On the last day of trial, Boland orally requested leave to amend her complaint. The trial court reserved ruling pending written argument. Boland subsequently filed a CR 15(b) motion on February 20. Boland sought to add a statutory derivative claim on behalf of BCH under RCW 25.15.386[3] for Wang's wrongful withdrawal of $433,700 from BCH's bank account exceeding her capital contributions and share of profits. Wang opposed the motion and Boland replied.

The parties filed written closing arguments. On March 12 the trial court entered written findings of fact and conclusions of law. In a footnote, the trial court denied Boland's motion to amend "as untimely and unfairly prejudicial to [Wang]" with no additional findings.

The trial court determined that Wang materially breached the parties' contract to evenly distribute BCH's profits and was unjustly enriched when she wrongfully withdrew $433,700 from the partnership's bank account that included Boland's share of the profits.[4]

The trial court found that though Boland failed to meet her 20 percent capital contribution obligation when she withdrew the Redmond land from the parties' consideration of Boland's capital contribution prior to the sale of fifth house, Wang did

---

[3] In their briefing, both parties appear to mistakenly refer to RCW 25.15.386 as "RCW 25.15.389," which does not exist. Boland's CR 15(b) motion cites RCW 25.15.386.

[4] The court determined that given its rulings on the breach of contract and unjust enrichment claims, it was unnecessary for the court to address the parties' conversion claims. The conversion claims are not at issue in the instant appeal.

not establish that Boland's conduct constituted a material breach of the parties' contract.

The trial court observed:

> No adverse consequences were suffered by BCH or Wang by Boland's failure to make a 20% capital contribution. Wang has not demonstrated that she or BCH lost any profits as a result of Boland's failure to make a 20% capital contribution. Had Boland made a 20% capital contribution, that contribution would have been returned to Boland upon dissolution of BCH.

Importantly, the trial court found that the parties' written agreement "did not specify what would occur if Boland did not contribute 20% of the capital investment, and the parties did not have an oral agreement as to this." This finding is unchallenged and is therefore a verity on appeal. See In re Est. of Jones, 152 Wn.2d 1, 8, 93 P.3d 147 (2004).

Additionally, the trial court found:

> Although Wang claims she is entitled to all the profits because she put-up the entire capital contribution, throughout the sale of the first four properties Wang and Boland shared profits equally. They shared profits equally after Wang told Boland that she was not interested in merging BCH with PRD (and thus co-owning [the Redmond land] with Boland) and after the rift over [the Redmond land] that occurred at the October 2021 meeting.
> …
> Had Redmond Raw Land been considered part of Boland's capital contribution through the sale of BCH's fifth property, Boland would have been entitled to full repayment of this capital contribution (i.e., she would keep [the Redmond land]), just as Wang was entitled to a full repayment of her capital contribution prior to the parties sharing the profits of BCH.
> …
> Wang's conduct prior to the sale of the 5th property indicates that she agreed that Boland was entitled to 50% of the profits from the first four property sales. Wang never questioned or complained about Boland's 50% distribution until this lawsuit [w]as filed.

The trial court found that $433,800 remained in BCH's bank account after the fifth house was sold. From that amount, the trial court found that "Wang was entitled to be

repaid $191,304 for her capital contribution," which "left $242,496 to [be] distributed as profit."

In its conclusion as to damages, the trial court stated:

> At the time Wang drained the BCH bank account, there remained $242,496 as net profit. A 50% share of that net profit is: $121,248. The parties' agreement was that they would share equally in the profits. The agreement does not identify any remedies for non-performance. Specifically, there was no remedy identified in the parties' agreement if either Boland or Wang failed to make her capital contribution. Notably, Wang does not identify any specific damages that she suffered because of Boland's failure to make her 20% contribution. There was no evidence that BCH was less profitable due to Boland's failure to make her 20% contribution.

The trial court awarded $121,248 to Boland to be paid by Wang under Boland's breach of contract and unjust enrichment claims.

The trial court denied the parties' cross-motions for reconsideration, stating in part:

> With her Motion for Reconsideration, Plaintiff [Boland] improperly seeks a windfall judgment. .... Boland's testimony at trial that she met her 20% capital contribution was not credible.
> …
> Defendant Wang's testimony that she would not have entered into an agreement with … Boland had she known that … Boland would fail to make her capital contribution was not credible. [Wang] needed … Boland for the renovations and sale of the properties. Her testimony to the contrary was not credible. [Wang] earned a substantial profit over a short period of time based on … Boland's sweat equity.

The trial court later entered a judgment reflecting the award of $121,248 to Boland payable by Wang. Wang appeals and Boland cross-appeals.

## DISCUSSION

### Standard of Review

In reviewing a trial court's decision following a bench trial, we ask whether substantial evidence supports the trial court's findings of fact and whether such findings

support the trial court's conclusions of law. Viking Bank v. Firgrove Commons 3, LLC, 183 Wn. App. 706, 712, 334 P.3d 116 (2014). Substantial evidence requires this court to determine if the evidence is "sufficient to persuade a rational, fair-minded person of the truth of the finding." Jones, 152 Wn.2d at 8. We consider the evidence and all reasonable inferences in a light most favorable to the prevailing party. Real Carriage Door Co., Inc. ex. rel. Rees v. Rees, 17 Wn. App. 2d 449, 457, 486 P.3d 955 (2021). "We do not review the trial court's credibility determinations or weigh conflicting evidence 'even though we may disagree with the trial court in either regard.'" In re Marriage of Black, 188 Wn.2d 114, 127, 392 P.3d 1041 (2017) (quoting In re Welfare of Sego, 82 Wn.2d 736, 740, 513 P.2d 831 (1973)). Unchallenged findings are verities on appeal. Jones, 152 Wn.2d at 8.

We review a trial court's conclusions of law de novo. Littlefair v. Schulze, 169 Wn. App. 659, 664, 278 P.3d 218 (2012). "The label applied to a [trial court's] finding or conclusion is not determinative; we 'will treat it for what it really is.'" Nguyen v. City of Seattle, 179 Wn. App. 155, 163, 317 P.3d 518 (2014) (quoting Para-Med. Leasing, Inc. v. Hangen, 48 Wn. App. 389, 397, 739 P.2d 717 (1987)). We may affirm a judgment or sustain an order on any basis supported by the pleadings and the record. Burnet v. Spokane Ambulance, 131 Wn.2d 484, 493, 933 P.2d 1036 (1997).

<u>Wang's Breach of Contract</u>

Wang does not challenge the trial court's determination that she materially breached the parties' contract to evenly share profits by unilaterally withdrawing BCH's funds after the sale of the fifth house. Rather, she contends that the trial court erred in awarding a portion of the funds to Boland, arguing that her material breach of the

contract was excused by Boland's prior material breach based on Boland's failure to meet her 20-percent capital contribution obligation. Because Wang did not establish that Boland's breach was material, we disagree.

To succeed in a breach of contract action, a plaintiff must prove that a valid agreement existed between the parties, the agreement was breached, and the plaintiff was damaged by the breach. Univ. of Wash. v. Gov't Emps. Ins. Co., 200 Wn. App. 455, 467, 404 P.3d 559 (2017). A material breach can suspend the injured party's contractual duties until the breaching party cures the defect. See DC Farms, LLC v. Conagra Foods Lamb Weston, Inc., 179 Wn. App. 205, 220-22, 317 P.3d 543 (2014). However, material breach is an affirmative defense to a breach of contract claim. See Wlasiuk v. Whirlpool Corp., 81 Wn. App. 163, 179, 914 P.2d 102, 932 P.2d 1266 (1996). "[I]f it is determined that a breach is material, or goes to the root or essence of the contract, it follows that substantial performance has not been rendered, and further performance by the other party is excused." DC Farms, 179 Wn. App. at 220. Therefore, it was Wang's burden as the party opposing Boland's breach of contract claim to show that Boland materially breached the parties' agreement to excuse Wang's failure to share profits from the sale of the fifth house. See Wlasiuk, 81 Wn. App. at 179.

"A material breach is one that 'substantially defeats' a primary function of an agreement." 224 Westlake, LLC v. Engstrom Props., LLC, 169 Wn. App. 700, 724, 281 P.3d 693 (2012) (quoting Park Ave. Condo. Owners Ass'n v. Buchan Devs., LLC, 117 Wn. App. 369, 383, 71 P.3d 692 (2003)). The materiality of a breach of contract is a question of fact and depends on the circumstances of each particular case. DC Farms, 179 Wn. App. at 221; 224 Westlake, 169 Wn. App. at 724. As such, we review a trial

court's determination of materiality for substantial evidence. See 224 Westlake, 169 Wn. App. at 724; Bailie Commc'ns, Ltd. v. Trend Bus. Sys., 53 Wn. App. 77, 82-83, 765 P.2d 339 (1988).

In determining whether a breach is material, Washington courts have considered guidance provided by the Restatement (Second) of Contracts § 241 (American Law Institute 1981), which states:

> [I]n determining whether a failure to render or to offer performance is material, the following circumstances are significant:
>
> (a) the extent to which the injured party will be deprived of the benefit which he reasonably expected;
>
> (b) the extent to which the injured party can be adequately compensated for the part of that benefit of which he will be deprived;
>
> (c) the extent to which the party failing to perform or to offer to perform will suffer forfeiture;
>
> (d) the likelihood that the party failing to perform or to offer to perform will cure his failure, taking account of all the circumstances including any reasonable assurances;
>
> (e) the extent to which the behavior of the party failing to perform or to offer to perform comports with standards of good faith and fair dealing.

DC Farms, 179 Wn. App. at 221 (alteration in original).

Here, there is no dispute that the purpose of the BCH partnership was to generate profits from flipping houses. As the trial court found below, Wang presents no evidence on appeal that BCH suffered profit losses or that she suffered damages because of Boland's failure to meet her capital contribution obligation. Wang baldly asserts in her opening brief that she presented "substantial evidence" of damages without any cites to the record to support her claim. Conclusory arguments unsupported by references to the record do not warrant this court's review. See Cook v. Brateng, 158

12

Wn. App. 777, 794, 262 P.3d 1228 (2010); RAP 10.3(a)(6). Wang has not met her burden to show that Boland's breach substantially defeated the primary function of the parties' partnership agreement.

Wang's purported legal authority is not persuasive. Wang cites Macri v. Bay Construction Co., 33 Wn.2d 625, 636-38, 206 P.2d 797 (1949), wherein the Washington Supreme Court determined that plaintiffs were not entitled to an accounting where they failed to perform their only obligation to contribute capital to a joint venture. In the instant case, the record supports that Boland's obligation under the agreement was not solely to contribute capital, but to perform the renovation and real estate services that proved necessary to generate BCH's profits from the sales of the five houses.

Additionally, Wang cites Simich v. Culjak, 27 Wn.2d 403, 408-10, 178 P.2d 336 (1947), for the Supreme Court's holding that a managing partner who did not fulfill his duties to account and act in good faith was not entitled to a share of the partnership's assets. In the instant case, the breach at issue is Boland's failure to meet her capital contribution obligation under the parties' partnership agreement. The record supports the trial court's finding that the parties did not condition a distribution of BCH's profits based on the status of Boland's capital contribution. The parties equally shared profits throughout the course of the partnership until Wang's wrongful withdrawal of BCH's funds following the sale of the fifth house. See, e.g., ex. 1145. The parties thus continued to share profits after Wang learned in October 2021, around the sale of the second house, that Boland was not investing the Redmond land in BCH as initially agreed upon. It is further undisputed on appeal that the parties did not have a written or

13

oral agreement as to consequences if Boland did not meet her capital contribution obligation.

We conclude that because Wang has failed to show that Boland's breach was material, the trial court did not err in awarding damages to Boland based on Wang's material breach.

### Findings on Damages

We decline Wang's request to remand the trial court's findings and conclusions for entry of sufficient findings under Washington's limited liability act, chapter 25.15 RCW. In distributing an LLC partnership's assets, a trial court must enter sufficient findings to demonstrate its understanding and application of applicable statutes. See Noble v. A & R Envtl. Servs., LLC, 140 Wn. App. 29, 35-37, 164 P.3d 519 (2007); Guntle v. Barnett, 73 Wn. App. 825, 831, 833-34, 837, 871 P.2d 627 (1994). Wang contends that the trial court's findings are insufficient to support its decision not to impose a penalty and award Wang damages for Boland's failure to meet her capital contribution obligation under the partnership agreement. Specifically, Wang argues that the trial court failed to properly apply RCW 25.15.206 and .196(3) under Washington's limited liability act.[5]

In the context of Wang's challenge, these statutes merely provide that a trial court must first look to the terms of an LLC's agreement in allocating distributions and that, under RCW 25.15.196(3), an LLC agreement "may" provide for penalties in the event a member fails to meet their capital contribution obligation. RCW 25.15.206, .196(3); see RCW 25.15.141; see also RCW 25.15.171 (authorizing an LLC agreement

---

[5] The parties agree that BCH is a limited liability company to which Washington's limited liability act applies. See RCW 25.15.006(7) (defining "limited liability company").

to provide for penalties in the event a manager fails to perform under terms and conditions of the agreement); RCW 25.15.006(8) (defining "limited liability company agreement"). This is consistent with the long-standing principle in partnership law that "'[t]he agreement … is the heart of the partnership'" to facilitate partners' ability to "'write their own ticket.'" Horne v. Aune, 130 Wn. App. 183, 201 n.8, 121 P.3d 1227 (2005) (internal quotation marks omitted) (quoting Seattle-First Nat'l Bank v. Marshall, 31 Wn. App. 339, 347, 641 P.2d 1194 (1982)).

Here, the trial court found, which Wang does not dispute, that the parties' agreement did not provide for consequences or any remedy in the event that Boland did not provide her capital contribution to BCH. Wang provides no authority to establish that the trial court was otherwise required to impose a remedy for Boland's failure to meet her capital contribution obligation under the partnership agreement. "Where a party does not cite to such authority, we assume there is none." Peterson v. Dep't of Lab. & Indus., 17 Wn. App. 2d 208, 237, 485 P.3d 338 (2021). Moreover, as stated above, Wang does not establish that she suffered harm to support a damages award under contract law. See DC Farms, 179 Wn. App. at 227. We conclude that Wang has failed to show that the trial court's damages award is deficient for sufficient findings.

Cross-Appeal

A. Amount of Damages Award

Boland contends on cross-appeal that the trial court erred in its calculation of damages because it failed to distribute to Boland unreimbursed construction costs for her company PRD's renovation services as part of her capital contribution to BCH following the sale of the fifth house. Boland argues that regardless of the trial court's

finding that she did not meet her 20-percent capital contribution obligation based on her withdrawal of the Redmond land, the trial court's lack of express finding as to whether Boland had any other unreimbursed capital contributions at the time of Wang's wrongful withdrawal warrants remand for the entry of findings supporting the amount of the damages award. We disagree.

Whether the amount of a damages award is reasonable is a question of fact that an appellate court reviews for abuse of discretion. Harmony at Madrona Park Owners Ass'n v. Madison Harmony Dev., Inc., 143 Wn. App. 345, 357-58, 177 P.3d 755 (2008) (citing Bunch v. King County Dep't of Youth Serv., 155 Wn.2d 165, 175, 116 P.3d 381 (2005)). A trial court abuses its discretion when its decision is manifestly unreasonable, exercised on untenable grounds, or is based on untenable reasons. Id. at 358. We will generally not disturb a trial court's damages award unless it is outside the range of substantial evidence in the record, shocks the conscience, or appears to be the result of passion or prejudice. Harmony at Madrona Park Owners Ass'n v. Madison Harmony Dev., Inc., 160 Wn. App. 728, 737, 253 P.3d 101 (2011) (citing Mason v. Mortg. Am., Inc., 114 Wn.2d 842, 850, 792 P.2d 142 (1990)). Damages need not be proven with mathematical certainty, and a trial court has discretion to award damages supported by competent evidence in the record. Id. (citing Mason, 114 Wn.2d at 850). "Evidence of damage is sufficient if it affords a reasonable basis for estimating the loss and does not subject the trier of fact to mere speculation or conjecture." Shinn v. Thrust IV, Inc., 56 Wn. App. 827, 840, 786 P.2d 285 (1990). A trial court must enter findings explaining the basis and method of its damages computation to provide an appellate court with sufficient information to effectively review the damages award. Id.

Generally, the measure of damages for breach of contract is that the injured party is entitled to recovery of all damages that naturally accrue from the breach, and to be put in as good a position as they would have been if the contract been performed. Nw. Land & Inv., Inc. v. New W. Fed. Sav. & Loan Ass'n, 57 Wn. App. 32, 43, 786 P.2d 324 (1990) (citing Eastlake Constr. Co. v. Hess, 102 Wn.2d 30, 39, 686 P.2d 465 (1984)). Under RCW 25.15.305(1), assets are distributed upon the winding up of an LLC in the order of creditors, members in satisfaction of liabilities, and then "[t]o members first for the return of their contributions and second respecting their limited liability company interests, in the proportions in which the members share in distributions." RCW 25.15.305(1)(a), (b), (c).

Here, the trial court's findings show that it determined damages for Wang's material breach by first subtracting the amount of Wang's unreimbursed capital contributions following the sale of the fifth house and then evenly dividing BCH's remaining profit between Boland and Wang in accordance with the parties' agreement to equally share profits. It is further apparent from the trial court's findings that the lack of distribution of any capital contribution to Boland was grounded in the court's finding that Boland's capital investment was limited to the Redmond land that she withdrew before the fifth house was sold. This finding is supported by the record, including Wang's testimony and the February 2021 balance sheet prepared by Boland. See Ex. 1132.

Boland's assertion that the trial court failed to decide whether Boland contributed capital, aside from the Redmond land, consisting of unreimbursed construction costs ignores the plain reading of the trial court's findings. The trial court found that "as of

17

February 2021, Boland was <u>relying</u> on [the Redmond land] as her capital contribution to BCH." (Emphasis added.) The court acknowledged that Boland would have been entitled to reimbursement of her capital contribution "[h]ad [the Redmond land] been considered part of Boland's capital contribution through the sale of BCH's fifth property," "<u>just as Wang was entitled to a full repayment of her capital contribution</u> prior to the parties sharing the profits of BCH." (Emphasis added.) The court also expressly characterized the funds remaining in BCH's account after Wang's improper withdrawal as "profits."

Even assuming arguendo the trial court's findings are not clear as to whether it considered the Redmond land as Boland's only form of capital contribution, thereby leaving open the possibility that BCH's funds following the sale of the fifth house included unreimbursed construction payments that Boland had contributed as capital, the absence of such a finding is presumptively a negative finding against Boland as the party with the burden of proving her capital contributions to BCH under the parties' partnership agreement. <u>See</u> <u>Taplett v. Khela</u>, 60 Wn. App. 751, 759, 807 P.2d 885 (1991) ("The absence of a finding on an issue is presumptively a negative finding against the person with the burden of proof.") (citing <u>Smith v. King</u>, 106 Wn.2d 443, 451, 722 P.2d 796 (1986)). As the fact finder, the trial court was not required to enter negative findings or to find that a certain fact had not been established. <u>Hering v. Dep't of Motor Vehicles</u>, 13 Wn. App. 190, 192, 534 P.2d 143 (1975).

Boland does not dispute on appeal that BCH paid her <u>company</u> PRD for the company's renovations of the first four houses. For the fifth house, she claims that she <u>individually</u> contributed payments for PRD's construction expenses as capital to BCH. In

support, Boland points to two admitted exhibits in the record: (1) a spreadsheet created by Boland dated January 17, 2022, showing Boland's ending balance in "capital" as $43,125.90[6] and (2) emails from Boland to Wang on January 17 and 18, 2022, stating that Boland's "leftover contribution is $43,779.10" based on "majority to the construction cost."[7] Apart from her own self-serving spreadsheet and emails, Boland provides no support or additional context for either of these numbers. Notably, Boland does not cite testimony regarding the purported values, including her own. The trial court expressly found Boland's testimony that she met her 20-percent capital contribution obligation not credible. The court was also free to reject Boland's claims of unreimbursed capital contributions as not credible. See Seattle Police Dep't v. Jones, 18 Wn. App. 2d 931, 945, 496 P.3d 1204 (2021). We defer credibility determinations and the weighing of contrary evidence to the trial court sitting as the finder of fact. Id.; Bartel v. Zucktriegel, 112 Wn. App. 55, 62, 47 P.3d 581 (2002).

We conclude that the trial court's determination of damages is supported by sufficient findings.

B. Denial of CR 15(b) Motion

We agree with Boland's contention on cross-appeal that the trial court abused its discretion in denying her motion to amend her complaint under CR 15(b).

CR 15(b)[8] authorizes a trial court to amend pleadings to conform to the evidence presented and issues actually litigated at trial to avoid the necessity of a new trial and a

---

[6] Ex. 122.
[7] Ex. 1146.
[8] CR 15(b) states in full:
When issues not raised by the pleadings are tried by express or implied consent of the parties, they shall be treated in all respects as if they had been raised in the pleadings. Such amendment of the pleadings as may be necessary to cause

multiplying of lawsuits. Green v. Hooper, 149 Wn. App. 627, 636, 205 P.3d 134 (2009). "At the discretion of the trial court, the pleadings may be amended to conform to the evidence at any stage in the action, including at the conclusion of a trial, and even after judgment." Id. A trial court cannot amend pleadings under CR 15(b) "'if actual notice of the unpleaded issue is not given, if there is no adequate opportunity to cure surprise that might result from the change in the pleadings, or if the issues have not in fact been litigated with the consent of the parties.'" Id. (quoting Harding v. Will, 81 Wn.2d 132, 137, 500 P.2d 91 (1972)).

Courts construe CR 15(b) liberally. Burlingham-Meeker Co. v. Thomas, 58 Wn.2d 79, 81, 360 P.2d 1033 (1961). An appellate court reverses a trial court's ruling on a CR 15 motion only on a showing of abuse of discretion. Green, 149 Wn. App. at 636; Micro Enhancement Int'l, Inc. v. Coopers & Lybrand, LLP, 110 Wn. App. 412, 433, 40 P.3d 1206 (2002). As referenced above, "[a] trial court abuses its discretion if its decision is manifestly unreasonable, exercised on untenable grounds, or is for untenable reasons." Green, 149 Wn. App. at 636.

Here, Boland filed her motion after the close of trial at the trial court's direction. CR 15(b) expressly allows amendment even after judgment. The trial court's basis for denying Boland's motion as "untimely" was improper.

---

them to conform to the evidence and to raise these issues may be made upon motion of any party at any time, even after judgment; but failure so to amend does not affect the result of the trial of these issues. If evidence is objected to at the trial on the ground that it is not within the issues made by the pleadings, the court may allow the pleadings to be amended and shall do so freely when the presentation of the merits of the action will be subserved thereby and the objecting party fails to satisfy the court that the admission of such evidence would prejudice him in maintaining his action or defense upon the merits. The court may grant a continuance to enable the objecting party to meet such evidence.

Additionally, the trial court erred in deciding that amendment of Boland's claims would be prejudicial to Wang. In her motion to amend, Boland sought to add the statutory derivative claim under RCW 25.15.386[9] based on Wang's withdrawal of BCH's funds following the sale of the fifth house. In response, Wang did not object and deferred to the trial court as to whether the issue of Wang's withdrawal had been sufficiently litigated to support Boland's motion to amend. In her reply brief to this court, Wang cites approvingly to Boland's reply below in support of the motion to amend that stated, "Defendants properly note that the focus of Boland's claims and the trial was the impropriety of Wang's withdrawal of $433,700."

In her opposition below to the motion to amend, Wang argued that Boland's closing trial brief "implies" that Wang could be liable to BCH by leaving it insolvent. Wang acknowledged that Boland did not put forth this new argument in her motion to amend nor in her proposed "Amended Complaint." Wang, nevertheless, raised the objection to prevent "any attempt by [Boland] to back door into this case an untried theory of liability." Boland replied that she was not asserting an insolvency claim in her amended complaint and only "noted BCH's insolvency in her closing argument to show how greedy, vindictive and reckless Wang was when she took her improper withdrawal … and actually owes more than Boland is seeking."

---

[9] Under RCW 25.15.386,

    A member may bring a derivative action to enforce a right of a limited liability company if:

    (1) The member first makes a demand on the members in a member-managed limited liability company, or on the managers of a manager-managed limited liability company, requesting that they cause the limited liability company to bring an action to enforce the right, and the managers or other members do not bring the action within a reasonable time; or

    (2) A demand would be futile.

In response to Boland's cross-appeal, Wang abandons her argument that Boland's motion to amend should not be granted as an attempt to introduce a new theory of liability based on BCH's insolvency. Wang also did not designate Boland's closing trial brief for this court's review. Even if the trial court was concerned about the introduction of a new theory, it could have exercised its discretion to limit the scope of Boland's proposed statutory derivative claim to Wang's withdrawal of BCH's sale proceeds following the sale of the fifth house.

Wang provides no explanation in her briefing to this court as to how the amendment of Boland's complaint to add a statutory derivative claim would cause her prejudice. Instead, Wang argues that Boland is not prejudiced by the court's denial of her motion to amend because the issue of Wang's withdrawal was litigated and determined in Boland's favor. Wang cites Kelly v. Foster, 62 Wn. App. 150, 157-58, 813 P.2d 598 (1991), wherein we held that plaintiff was not prejudiced by trial court's denial of CR 15(b) motion because the motion was submitted to request attorney fees on a tried breach of fiduciary duty claim and the trial court "fully consider[ed] and rule[d] upon all of [the plaintiff's] claims[, including her fiduciary duty claim,] in respect to attorney's fees." Wang conflates Boland's individual claims with Boland's request to pursue liability on behalf of BCH, which the trial court's CR 15(b) denial precluded Boland from doing. See RCW 25.15.386. To this end, Boland was also prevented from requesting attorney fees from BCH's potential recovery under RCW 25.15.401.[10]

---

[10] In response to Boland's statement in her cross-appeal that adding the statutory derivative claim would allow Boland to request attorney fees under RCW 25.15.401, Wang asserts that the statute would not allow for a fee award against Wang as an individual. The statute permits the trial court, if Boland is successful in her derivative action brought on BCH's behalf, to award Boland as the plaintiff "reasonable attorneys' fees, from the recovery of the limited liability company." RCW 25.15.401.

Because CR 15(b) must be liberally construed in the movant's favor and the record does not support that the addition of a statutory derivative claim based on Wang's withdrawal of BCH's funds would prejudice Wang, the trial court abused its discretion in denying Boland's motion to amend. Accordingly, we reverse in part the trial court's findings and conclusions as to the denial of Boland's CR 15(b) motion and remand with instructions for the trial court to grant Boland's CR 15(b) motion and for further proceedings as to this issue.

*C. Attorney Fees on Appeal*

Boland submits that this court should award her attorney fees under RAP 18.1 and RCW 25.15.401 because she would have prevailed on a statutory derivative claim under RCW 25.15.386 had the trial court granted her motion to amend. Boland puts the cart before the horse. The merits of Boland's statutory derivative claim is not at issue in the instant appeal. Moreover, we cannot assume that Wang still would have chosen to appeal had the trial court granted Boland's motion to amend and ruled in her favor as to a related claim. Because Boland does not provide a basis to support an award of appellate attorney fees on the record before us, we deny her request.

CONCLUSION

We affirm the trial court's decision as to Boland's breach of contract claim and its determination of damages. We reverse the trial court's denial of Boland's motion to amend her complaint under CR 15(b), and remand with instructions for the trial court to

grant Boland's motion to amend and for further proceedings on this issue.

Coburn, J.

WE CONCUR:

, ACJ

Dwiell, J.